**STATE of Missouri, Appellant,**

v.

**Christina A. KRILEY, Respondent.**

**No. WD 55397.**

Missouri Court of Appeals,
Western District.

July 21, 1998.

Appeal from the Circuit Court of Platte County; Ward B. Stuckey, Judge.

W. Brent Powell, Asst. Pros. Atty., Platte City, MO, for Appellant.

Mark M. Ferguson, N. Kansas City, MO, for Respondent.

Before HANNA, P.J., and LAURA DENVIR STITH and EDWIN H. SMITH, JJ.

EDWIN H. SMITH, Judge.

The State of Missouri, pursuant to § 547.200,[1] appeals the judgment of the circuit court sustaining the motion of Christina A. Kriley, respondent, to suppress evidence. The respondent stands charged in the Circuit Court of Platte County with the class B felony of attempting to manufacture a controlled substance, methamphetamine, in violation of § 195.211, and the class D felony of endangering the welfare of a child in the first degree, in violation of § 568.045.

In its sole point on appeal, the State claims that the trial court erred in sustaining the respondent's motion to suppress evidence pursuant to the "exclusionary rule," because the warrantless seizure of the methamphetamine by the drug task force officers did not violate her Fourth Amendment right to be free from unreasonable searches and seizures in that they were lawfully inside the structure attached to the residence when the methamphetamine was found in plain view.

We affirm.

## Facts

On March 31, 1997, a Platte County deputy sheriff discovered several abandoned trash bags on 45 Highway and I–435 in Platte County, Missouri. The bags contained, *inter alia,* rubber tubing; cat litter; and empty

---

1. All statutory references are to RSMo 1994, unless otherwise noted.

cans of acetone, Naphtha and Coleman fuel, all of which are products commonly used in the manufacture of methamphetamine. Also discovered in one of the trash bags was an envelope which appeared to be a pager bill addressed to: Jimmy James, 7603 NW 144th Street, Platte City, Missouri.

On April 3, 1997, Drug Enforcement Agency Task Force officers, David Kissee of the Platte County Sheriff's Department and James Morgan of the Kansas City, Missouri, Police Department, went to the residence located at 7603 NW 144th Street to speak with its residents about the items that were recovered from the trash bags and to verify the current residence of Jimmy James. Due to a large canine chained near the front entry of the residence, Deputy Kissee and Officer Morgan went to the rear of the residence, looking for an alternate entry. Once at the rear, they found a structure attached to the residence which enclosed an inner door which continued into the residence.

The structure was approximately five feet by twelve feet, enclosed by a roof and four walls. It had no door. One exterior wall was made of concrete, brick, wood and glass. Another exterior wall was shingled and painted in the same manner as the exterior of the main house. The roof and flashing were continuous between the main portion of the house and the structure. There were numerous items in the structure, including a freezer, insulation and car parts. The structure appeared to be wired for electricity and was apparently being used by the residents.

Rather than knocking on the entry to the structure, Deputy Kissee and Officer Morgan entered the structure, uninvited and without any exigent circumstances, and knocked on the inner door located inside. As Officer Morgan was knocking, Deputy Kissee observed a clear glass mason jar containing a white powdery substance. The jar was located on the top of a freezer inside the structure.

Deputy Kissee alerted Officer Morgan to the jar. They both smelled it and agreed that the odor emanating from it was a scent they both knew through their training and experience to be associated with methamphetamine. Deputy Kissee removed the lid of the jar; removed a small portion of the white powdery substance and placed it on a sheet of paper; and then placed the jar in its original position to prevent the residents from discovering that they had been there. Deputy Kissee placed the sample that had been removed from the jar into a field test packet, which gave a presumptive positive indication for the presence of an amphetamine-based narcotic. When no one came to the door and no one appeared to be inside the residence, the officers photographed the area and left.

Based on the methamphetamine seized on April 3, 1997, the Honorable James W. Van Amburg, Associate Circuit Judge of the Circuit Court of Platte County, issued a search warrant for the residence located at 7603 NW 144th Street on April 6, 1997. On April 7, 1997, at approximately 9:30 p.m., agents of the Platte County Sheriff's Department attempted to execute the search warrant. While the agents were en route, Deputy Matt Dodson, who was conducting surveillance at the residence, observed a man on the front porch of the house holding a rifle with a scope. The attempt to serve the warrant on that date was abandoned.

On April 8, 1997, at approximately 5:30 p.m., the Platte County Sheriff's Department executed the search warrant on the residence. Found inside the house were the respondent and her eight-month-old child. Also found inside the residence was an operating methamphetamine laboratory, along with anhydrous ammonia, red phosphorous, iodine crystals, ephedrine, Coleman fuel, Red Devil lye, Pyrex plates, glassware, flasks, rubber tubing and other items used in the manufacture of methamphetamine.

The respondent was arrested and Mirandized, after which she confessed to having assisted Jimmy James with the manufacture of methamphetamine at the residence and having fed, clothed and slept with her young child in the room of the residence where the laboratory operated. On April 30, 1997, a two-count indictment was filed in the Platte County Circuit Court charging the respondent with the class B felony of attempting to manufacture a controlled substance,

§ 195.211, and the class D felony of endangering the welfare of a child in the first degree, § 568.045.

On December 26, 1997, the respondent filed a motion to suppress the methamphetamine seized without a warrant and the other items seized pursuant to the search warrant on April 8, 1997. On January 7, 1998, a hearing on the respondent's motion to suppress was held by the Honorable Ward B. Stuckey in the Circuit Court of Platte County. After hearing evidence and the arguments of the parties, the trial court sustained the respondent's motion.

This appeal follows.

## Standard of Review

■ Our "review of a trial court's ruling on a motion to suppress is limited to a determination of sufficiency of the evidence to sustain the trial court's finding." *State v. Cook*, 854 S.W.2d 579, 581 (Mo.App.1993) (citing *State v. Villa–Perez*, 835 S.W.2d 897, 902 (Mo. banc 1992)). We will affirm the judgment of the trial court if there is sufficient evidence which would support the trial court's decision to sustain the motion to suppress on any ground alleged in the respondent's motion. *State v. Duke*, 924 S.W.2d 588, 589 (Mo.App.1996). We will only reverse the trial court's judgment if it is clearly erroneous. *Cook*, 854 S.W.2d at 581 (citing *State v. Milliorn*, 794 S.W.2d 181, 183 (Mo. banc 1990)). The trial court's judgment is clearly erroneous if we are left with the definite and firm belief that a mistake has been made. *State v. Johnson*, 901 S.W.2d 60, 62 (Mo. banc 1995).

■ We will defer to the trial court's findings of fact, but make an independent evaluation of the conclusions of law the trial court draws from its factual findings. *Porter v. Falknor*, 895 S.W.2d 187, 189 (Mo.App. 1995) (citations omitted); *see also State v. Smith*, 346 N.C. 794, 488 S.E.2d 210, 212 (1997). Where there is no dispute as to the underlying facts, the determination of the reasonableness of a search and seizure, under the Fourth Amendment, is a question of law. *State v. Kovach*, 839 S.W.2d 303, 307 (Mo.App.1992) (quoting *Milliorn*, 794 S.W.2d

at 184). We will view the evidence in the light most favorable to the decision of the trial court even though we may have weighed the evidence differently. *Cook*, 854 S.W.2d at 581 (citing *Milliorn*, 794 S.W.2d at 184). When there is conflicting evidence, we will defer to the trial court's determination regarding the credibility of the witnesses, accepting or rejecting all, part, or none of the testimony it hears. *Cook*, 854 S.W.2d at 581 (citing *Villa–Perez*, 835 S.W.2d at 902). "If the trial court's ruling 'is plausible in light of the record viewed in its entirety,' [the] court 'may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Kovach*, 839 S.W.2d at 307 (quoting *Milliorn*, 794 S.W.2d at 184).

## I.

■ The State claims that the trial court erred in sustaining the respondent's motion to suppress evidence because the seizure of the methamphetamine by the task force officers did not violate her Fourth Amendment right to be free from unreasonable searches and seizures in that they were lawfully inside the structure attached to the residence when the methamphetamine was found in plain view. In making this claim below, the burden was on the State to show, by a preponderance of the evidence, that the search was legal and the motion to suppress should be denied. *Duke*, 924 S.W.2d at 589.

■ The respondent makes a two-fold argument as to the State's claim that the seizure of the methamphetamine was lawful, both involving the parameters of a plain view seizure. The plain view doctrine provides that anything an individual knowingly exposes to public view, even in his or her own home, involves no reasonable expectation of privacy and is not a subject of Fourth Amendment protection. *State v. Akers*, 723 S.W.2d 9, 14 (Mo.App.1986) (citing *Texas v. Brown*, 460 U.S. 730, 741, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). The appellant first contends that the task force officers were not lawfully inside the structure where the seizure occurred, invalidating their warrantless seizure

of the methamphetamine, in that a plain view seizure is not lawful unless the task force officers had a right to be where they were when the methamphetamine was discovered in plain view. *See State v. Collins,* 816 S.W.2d 257, 260–61 (Mo.App.1991) (citations omitted). "[I]n the absence of a privacy interest in the property already relinquished, or of an exigent circumstance to excuse a warrant—'plain view *alone* is never enough to justify the warrantless seizure of evidence.'" *Akers,* 723 S.W.2d at 14 (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 468, 91 S.Ct. 2022, 2039, 29 L.Ed.2d 564 (1970)) (emphasis in original). In the alternative, the respondent contends that even if the task force officers were lawfully inside the structure, a plain view seizure did not allow them to open the mason jar containing the methamphetamine and take a sample. Logically, we must first determine whether the task force officers were lawfully in the structure attached to the residence at the time they were alleged to have seen the methamphetamine in plain view, in that, if they were not, the plain view seizure was not lawful, requiring us to affirm the trial court's suppression of the challenged evidence without determining the issue of whether a plain view seizure allowed the task force officers to open the mason jar containing the methamphetamine and take a sample.

In her motion to suppress, the respondent alleged that the law enforcement officers violated her Fourth Amendment right to be free from unreasonable searches and seizures because they

> unlawfully searched and seized personal property from [her] residence and/or the 'curtilage' of [her residence]; ... the search was made without a valid warrant and without lawful authority; ... the property seized was property not subject to seizure under the law; ... the [task force officers] entered the 'curtilage' of the premises without any 'plain view' of the alleged controlled substance or with the permission or consent of the [respondent] or any other resident; ... [the task force officers] did not have the authority to enter the 'curtilage' because they lack[ed] a qualified search warrant, the circumstances failed to lead [them] to any emer-

gency situation which would authorize entrance and the said powdery substance was not in 'plain view' prior to entering the said curtilage. . . .

In other words, she alleged that a warrantless seizure was not justified under the circumstances presented because the officers were not lawfully inside the structure where the methamphetamine was found in that the structure was part of the residence or the curtilage of the residence, and there were no exigent circumstances justifying their entry. In addition to alleging that the seizure of the methamphetamine should be suppressed, she further alleged that the items seized on April 8, 1997, pursuant to the search warrant, should also be suppressed as fruit of the poisonous tree. *See State v. Childress,* 828 S.W.2d 935, 944 (Mo.App.1992) (citations omitted) (holding that if an original search and seizure was improper, evidence obtained as a result of the subsequent search warrant based on the illegal search must be excluded as fruit of the poisonous tree).

After hearing evidence on the respondent's motion to suppress, the trial court sustained her motion, stating, in pertinent part, as follows:

> ... This is a close case. The shed or lean-to or whatever you care to call it I believe is clearly part of the house. There's clearly no door on it.
>
> I would be more comfortable, or I could be comfortable with the police officers coming on the premises, the dog's in the way so they have to find another door to knock on. I think I can understand that.
>
> I can understand them coming to the back of the house, looking in and seeing that the actual door to the house is inside this shed, lean-to, whatever. It wouldn't do much good to knock on the outside of this house. They've got to go knock on the door. I could understand that.
>
> But when they see a mason jar sitting there, open it up and take a sample, I believe that's a violation of the [respondent's] Fourth Amendment Rights. And the Motion to Suppress is sustained.

And therefore the use in evidence of the search or the fruits of that search is suppressed.

This ruling of the trial court is confusing as to the specific basis on which it sustained the respondent's motion to suppress. On the one hand, it is clear that the trial court found that the structure was part of the house, which would render the law enforcement officers' warrantless presence in the structure unlawful, absent some legally recognized justification. *State v. Roberts*, 957 S.W.2d 449, 452 (Mo.App.1997). On the other hand, the statement that the court could "understand [the officers] coming to the back of the house," could be interpreted to mean that it found that they were lawfully inside the structure, but that the seizure of the methamphetamine was not lawful pursuant to plain view. What is clear is that the seizure did not pass the "smell test" of the trial court. In any event, because we will affirm the decision of the trial court to sustain a motion to suppress if there is sufficient evidence which would support its decision on any ground alleged in the movant's motion, we must examine both possible bases for the trial court's sustaining the respondent's motion to suppress. *See Duke*, 924 S.W.2d at 589.

Evidence is suppressed pursuant to the "exclusionary rule," which is based on the Fourth Amendment. *Willis v. State*, 630 S.W.2d 229, 233–34 (Mo.App.1982). The rule is "an extraordinary sanction, judicially imposed, to limit searches and seizures to those conducted in strict compliance with the Fourth Amendment. It is a judicially created remedy designed to safeguard Fourth Amendment rights...." *Id.* (citations omitted). The purpose of the Fourth Amendment is to protect the privacy and security of individuals from arbitrary invasions by the government by imposing a reasonableness standard on the discretion exercised by law enforcement officials in conducting searches and seizures. *State v. Damask*, 936 S.W.2d 565, 570–71 (Mo. banc 1996) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653–54, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)).

Determinations as to the level of protection afforded an individual by the Fourth Amendment from governmental intrusion are inevitably contextually driven and require the Court to balance privacy rights against the government's interest in enforcing the law.

*State v. Rodriguez*, 877 S.W.2d 106, 108 (Mo. banc 1994).

[W]hether a warrantless search is constitutionally inoffensive turns on the 'concrete factual context of the individual case'. *Sibron v. State of New York*, 392 U.S. 40, 59, 88 S.Ct. 1889, 1901, 20 L.Ed.2d 917, 932 (1968). The cardinal significance of the facts on a case to case basis cannot be minimized because all warrantless searches, subject only to certain well delineated fact oriented exceptions, are per se constitutionally offensive. (Citations omitted).

*State v. Oberg*, 602 S.W.2d 948, 950 (Mo.App.1980). In other words, warrantless searches and seizures are presumptively invalid unless a legally recognized justification existed for the same, such as the existence of exigent circumstances. *Roberts*, 957 S.W.2d at 452; *Cooper v. Gammon*, 943 S.W.2d 699, 704 (Mo.App.1997). The Fourth Amendment prohibits only unreasonable seizures; thus, in a Fourth Amendment challenge to a seizure, the question is whether it was reasonable. *Damask*, 936 S.W.2d at 571.

"Generally, a seizure undertaken without probable cause and without the authority of a warrant issued by a neutral magistrate is reasonable within the meaning of the Fourth Amendment only to the extent that the government's interests in conducting the search and seizure outweighs the individual's reasonable expectations of privacy."

*Rodriguez*, 877 S.W.2d at 108 (citing *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578–79, 45 L.Ed.2d 607 (1975)).

It is undisputed that the seizure of the methamphetamine by the drug task force officers was a warrantless seizure which the State does not attempt to justify on any basis other than its claim that the officers were lawfully in the structure, as a prerequisite to their plain view seizure of the methamphet-

amine, based on a "knock and talk" justification. As such, we are required to determine the exact nature and reach of this justification.

The State does not point to any authority which specifically recognizes the knock-and-talk justification on which it relies for asserting that the officers were lawfully in the structure when the methamphetamine was discovered. And, as far as we are able to determine, this investigative procedure, by name, has not heretofore been addressed by our appellate courts. However, other jurisdictions which have addressed it by name have described it generally as an investigative procedure or tactic used by law enforcement officers where they proceed to a particular address to contact the occupant about a suspected crime when they do not have probable cause to obtain a search warrant for the residence. Once contact with the occupant is made, the law enforcement officers request permission to enter. After gaining entry, the officers inform the occupant that they are investigating information regarding a crime and ask for permission to search. If the occupant refuses, then the officers leave. *See Smith*, 488 S.E.2d at 212.

■ Although our appellate courts have not addressed the knock-and-talk investigative procedure by name, we find it is nothing more than a catch phrase to describe police conduct that was recognized and approved by this court in *Akers*. There, this court held that "[i]t is altogether proper for police with legitimate business to enter the areas of curtilage open to the public. Thus, it is altogether proper for the police to call at a particular house to seek admittance in the course of a criminal investigation, or official business." *Akers*, 723 S.W.2d at 14–15 (citations omitted). In other words, this justification for a law enforcement officer's warrantless presence at a residence, without any other justification, allows him or her to investigate a crime or to conduct official business at a residence in places where the public is invited. The rationale for this justification is obvious and basically the same rationale given for removing from *Fourth Amendment* protection a plain view seizure—that there is no reasonable expectation of privacy subject to Fourth Amendment protection where the public at large is welcome.

Given the fact that the knock-and-talk justification, for purposes of warrantless searches and seizures, only allows a law enforcement officer to be where the public can be, the issue for us to decide here is whether the structure attached to the residence was open to the public. If it was, then the prerequisite to a plain view seizure, that the officers' entry into the structure was lawful, would be satisfied. However, if the structure was not open to the public, then the law enforcement officers had no justification for being inside it without a warrant, invalidating the subsequent plain view seizure of the methamphetamine by them, requiring the suppression of evidence by the trial court.

The trial court stated on the record that the structure was a part of the residence. Of course, if it was actually a room of the residence not open to the public, the State offers no justification for a warrantless entry there. However, even assuming, *arguendo*, that the structure was not a room of the residence, it was at the very least part of its curtilage, *see State v. Fierge*, 673 S.W.2d 855, 856 (Mo.App. 1984) (defining curtilage as including "all outbuildings used in connection with the residence, such as garages, sheds, barns, yards, and lots connected with or in the close vicinity of the residence"); *State v. Adams*, 791 S.W.2d 873, 877 (Mo.App.1990) (defining curtilage as an "inclosed space of ground and buildings immediately surrounding a dwelling house ..."), subject to Fourth Amendment protection, *State v. Schweitzer*, 879 S.W.2d 594, 596 (Mo.App.1994), unless it was open to the public. *Akers*, 723 S.W.2d at 14–15. The question is whether it was open to the public.

At the hearing on the respondent's motion to suppress, Deputy Kissee described the structure as an alcove or lean-to. However, the evidence in the record and the findings of the trial court reveal that it was much more than a lean-to. The structure was approximately five feet by twelve feet, enclosed by a roof and four walls, counting the common wall with the residence, with no floor or a door, only a doorway. One exterior wall appeared to be made of concrete, brick, wood

and glass. Another wall was shingled and painted in the same manner as the exterior of the main house. The roof and flashing were continuous between the main portion of the house and the structure. There were numerous items in the structure, other than the methamphetamine, including a freezer, insulation and car parts. The structure appeared to be wired for electricity and was from all appearances being used by the residents for various purposes.

Given the construction of the structure, this was obviously not a case of law enforcement officers appearing and knocking at what would typically be considered an outer entry to a residence open to the public, such as a typical porch area. To get to the inner door, where the alleged justified knocking occurred, the officers had to pass through an attached and enclosed structure. Admittedly, the structure did not have a door, a factor which would weigh against an expectation of privacy therein. However, this factor has to be weighed against the other factors that did evince a reasonable expectation of privacy. In looking at all the factors, in a close case, we conclude that the occupants of the residence in question closed off the area consistent with a reasonable expectation of privacy therein. Put another way, it is reasonable to infer that the occupants of the residence would have been surprised to find uninvited guests in the structure. As such, we fail to see how the knock-and-talk justification for being in the structure outweighed the appellant's reasonable expectation of privacy.

The reason given by the State in its brief for the law enforcement officers entering the structure to knock on the inner door was that it would have been futile for them to knock on the doorway to the structure in that the residents would not likely have heard their knocking and would not have responded. In line with this reasoning, the trial court did state that it understood why the officers felt the need to proceed through the structure to knock on the inner door. However, the mere fact that it was "understandable" that the officers desired to proceed to the inner door to improve the chances of their knocking being heard did not constitutionally justify their entry. This is so in that, to justify a denial of Fourth Amendment protection simply because law enforcement believes its criminal investigation would be enhanced by particular investigative conduct, would, as a practical matter, completely abrogate the protection afforded by the amendment.

Given the record, unless we are to find as a matter of law, which we decline to do, that the absence of a door on the structure alone required the trial court to find that it was an area open to the public at large, regardless of the other measures taken by the occupants thereof to insure their privacy, the evidence would demonstrate that the structure was not open to the public, as required to justify the officers' entry under a justification of "knock and talk." As such, the officers would not have been lawfully in the structure when the alleged plain view seizure of the methamphetamine occurred, thereby invalidating the seizure. And, because the State does not assert any justification for the officers' warrantless entry into the structure, other than the justification of "knock and talk," the record would support the trial court's decision to suppress the evidence, requiring us to affirm.

Point denied.

Our holding here should not be misconstrued to mean that a law enforcement officer would never be justified in entering an enclosed porch or similar area for purposes of the knock-and-talk justification. What we hold is that, under the particular circumstances presented here, the State failed to carry its burden of proof to establish that the task force officers were justified in being in the enclosed structure in question which was a prerequisite to validating the plain view seizure of the methamphetamine.

In holding as we do, we are not unmindful of the fact that there are those who believe that obvious criminal behavior should not go unpunished simply because of a "mere procedural technicality." However, no matter how distasteful it may be to suppress evidence where there is every indication of the defendant's guilt, we do not view the Fourth Amendment right of all citizens to be free from unreasonable searches and seizures to be a "mere legal technicality." In this respect, we would echo the sentiments of Judge

Breckenridge, as expressed in her opinion in *State v. Slavin,* 944 S.W.2d 314, 321 (Mo.App. 1997), that:

> Although there is an inclination to avoid reversing convictions on 'procedural' grounds, particularly where the trooper's hunch bore fruit, this court regards the protection of the Fourth Amendment as more than a mere technicality. It must be remembered that '[t]he issue of guilt of the defendant ... is irrelevant to the determination of whether the evidence sought to be suppressed is admissible at the trial of the criminal charge.' [*State v.*] *Donohoe,* 770 S.W.2d [252] at 257 [Mo.App. 1989]. The Fourth Amendment is the vehicle by which all citizens' rights are protected. As the Missouri Supreme Court has stated: ·

> [T]he prosecution's burden of proof at a suppression hearing is not a technicality; it plays a powerful and integral role in the effort to ensure the effectiveness of the Constitution's Fourth Amendment prohibition against unreasonable searches and seizures. The protection of the citizens' Fourth Amendment rights supersedes any benefit derived from bending the law to secure a single conviction.

*State v. Miller,* 894 S.W.2d 649, 657 (Mo. banc 1995).

*Slavin,* 944 S.W.2d at 321. And, as stated by this court in *Oberg,*

> [T]he suppression of evidence resulting from unlawful searches is neither designed to frustrate those charged with the enforcement of our laws nor to shield the guilty. Doing so is nothing more or nothing less than judicial compliance with the positive mandate of the Fourth Amendment that all citizens, the guilty and innocent alike, shall not be subjected to unreasonable searches and seizure.

*Oberg,* 602 S.W.2d at 955. The guarantee of the Fourth Amendment " 'marks the right of privacy as one of the unique values of our civilization....' " *Id.* (quoting *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 192, 93 L.Ed. 153 (1948)).

## Conclusion

The judgment of the trial court sustaining the respondent's motion to suppress evidence is affirmed.

All concur.